DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| United States of America, | CASE NO. 5:04 CR 169 |
| Plaintiff, | |
| v. | MEMORANDUM OPINION ANALYZING THE SENTENCING FACTORS SET FORTH IN 18 U.S.C. SECTION 3553(a) |
| Clifford L. Cousins, a.k.a. Abdullah Jihad Al Malik, | |
| Defendant. | |

### I. Introduction

The indictment in this case was filed April 6, 2004, and charged the defendant with two counts of threats against the President of the United States in violation of 18 U.S.C. § 871 and one count of making threats against the President's family in violation of 18 U.S.C. § 879.

Counsel for the defendant moved for a competency examination and hearing. (*See* Docket No. 10). The Court granted the motion, but after the forensic psychological report was filed, the Court found the defendant competent to stand trial on October 7, 2004. On November 17, 2004, the defendant entered pleas of guilty to the three-count indictment and was thereafter sentenced on February 7, 2005, to a period of 48 months with each count to be served concurrently but consecutive to the sentence being served by the defendant in the custody of the State of Ohio.

The Sixth Circuit, on appeal, set aside the defendant's sentence because this Court had varied upward by a total of two months from the maximum of the advisory guideline range

(1:04 CR 169)

without giving notice to the defendant that it was considering an upward variance.  See *United States v. Cousins*, 469 F3d. 572 (6th Cir. 2006).

The Court conducted, as directed by the remand, a new sentencing hearing on May 16, 2007.  At the conclusion of the sentencing hearing, the Court sentenced the defendant to a period of 60 months on each of the three counts with those sentences to run concurrent with each other, but consecutive to the sentence that the defendant is now serving in the state of Ohio.  The Court's reasoning follows.

During the pendency of the appeal and prior to the decision of the Sixth Circuit, the defendant engaged this Court in correspondence.  Initially, the defendant requested the Court to order the sentence of 48 months to be served prior to completion of the three state sentences for homicide, which the defendant is presently serving in the Ohio correctional system.

The Court corresponded with the defendant and advised him that it did not have the power to modify the sentence as requested by the defendant.

The defendant then responded with a letter dated June 2, 2006, and after threatening to have the judge's wife beheaded, stated "People never took things serious just like the people Im [sic] in jail for murdering, but you should have seen that look on their face when they were going to die by the wrath of Allah.  You have the choices of contacting that federal court (presumably the Sixth Circuit) and letting them no [sic] that you gave me a false conviction or else you die along with Bush's Administration."

2

(1:04 CR 169)

Following the remand from the Sixth Circuit, and against the background of the defendant's threatening letter of June 2, 2006, the Court published an order on January 8, 2007, putting the defendant on notice that it would consider an upward variance during the re-sentencing process, and would consider the threatening letter in determining whether to impose a sentence that would constitute an upward variance from the advisory guideline range.

At the sentencing hearing conducted on May 16, 2007, counsel for the government took the position that the defendant was no longer entitled to a three level reduction for acceptance of responsibility by reason of the defendant's threatening letter of June 2, 2006. The government cited the decisions in *United States v. Morrison*, 983 F2d. 730 (6th Cir. 1993) and *United States v. Banks*, 252 F3d. 801 (6th Cir. 2001) for the proposition that the threat to kill the wife of the sentencing court is similar enough to a threat to kill the wife of the President of the United States so as to negate the defendant's right to a three level reduction for acceptance of responsibility. Before ruling, the Court reviewed the provisions of 18 U.S.C. § 115 and 18 U.S.C. § 1114 and concluded that the threat of the defendant to kill the wife of the sentencing court was similar enough under the teachings of the above-cited decisions of the Sixth Circuit to negate a reduction of three levels for acceptance of responsibility. In so deciding, the Court rejected the defendant's proposition that the earlier calculation of the advisory sentencing guidelines, as determined in 2005 during the original sentencing hearing, was *res judicata* as claimed by defendant's counsel. In the Court's view, a remand for re-sentencing reopens the requirement of the Court to determine the advisory sentencing guideline range. Following that view, the Court finds, after denying the defendant a three level downward adjustment for acceptance of

3

(1:04 CR 169)

responsibility, that the recalculated advisory sentencing guideline range is 51 to 63 months based on an offense level 17 and a criminal history category of VI. The Court recognized that there is no jurisprudence to guide the Court on the *res judicata* issue and the Sixth Circuit may well decide, on appeal, that the earlier calculation of the advisory sentencing guideline range is *res judicata*. Against that background, the Court's sentencing memorandum in this case addresses alternatively the issue of an upward variance if the Sixth Circuit determines on appeal that the earlier determined advisory sentencing guideline range was 37 to 46 months. Under either scenario, the Court is of the opinion that the sentence in this case should be a period of 60 months with supervised release for a period of three years. The Court's analysis, as required by 18 U.S.C. § 3553(a), follows.

## II.  The Analysis Required by 18 U.S.C. § 3553(a)

The Court sets forth its analysis of the sentencing factors required by *Booker* and the statutory guidance provided by 18 U.S.C. §3553(a) as follows:

**(a) Factors to be considered in imposing a sentence.**

The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider -

**(1) The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

The presentence report sets forth the offense conduct in paragraphs 8 through 10 which states as follows:

4

(1:04 CR 169)

>On or about December 20, 2001, Clifton L. Cousins, a.k.a. Abdullah Jihad Al Malik, sent a letter to United States President George W. Bush at the White House from the Southern Correctional Institution in Lucasville, Ohio. The letter read, "First of all I'd like to say whoever opened this welcome to the world of "<u>Anthrax</u>" as it was written in the book of life that the chosen people shall rise and you white devils will fall. It is also written in the Islamic Law that any muslim is to aid/assist when a Islamic Jihad has been declared and its time that the people of "America" recognize that George Bush and all other presidents whom has risen must fall with (America). America has stolen the Blacks identity and their country and now America with President Bush backing is trying to destroy another people and his her country and religion for their self purpose and gain. I am a muslim who has been held as a political prisoner and Im gonna stand firm and aide the cause of my muslim brother Osama Bin Laden for the rightious call. I maybe doing life in Prison but I personally want you George Bush to know that Im affiliated with a organization and I do have ties to have you Murdered here in the hells of America. You and your followers will die by the hands of us Muslim for your corrupt ways and how you've destroy that Blacks true identity and Country and how you trying to destroy the Afghan people and their religion. It is your foul ways you may take this small letter and its contents lightly but my next move is gonna be what the muslim will call a day of rejoicing. Cause Yes indeed you George Bush is the real terrorist and you and the likes of you have been terrorist for year." [sic]

>On December 15, 2003, Cousins was interviewed at the Ohio State Penitentiary in Youngstown, Ohio by special agents. During the interview, Cousins admitted to writing the threatening letter and renewed his threat against the President and also threatened his family. The defendant wrote a voluntary statement to that effect which included in part, "I guarantee George Bush whether Im still locked up or not that I will for see the distruction of him and his people...I have the ties and connections...And if we can't get you your daughters down to your dogs will feel Allah's wrath...[T]heir will be attempts on your life. If we don't get you your kids are next..." [sic]

>During that interview, Cousins related he wants to kill the President himself by using a sniper rifle with a scope or a suicide

5

(1:04 CR 169)

>>bomb.  Cousins stressed the need to "scope out" before attacking. He stated, "I would get his family first."  He also added he would pursue the President after he is out of office.  He also informed the agent if he were incarcerated for life without parole, he would have someone on the outside do it and mentioned an individual by the name of James Dunson.  Lastly, he indicates his goal before incarceration was to gather enough people to build an army to take on the U.S. Army.

The defendant's acceptance of responsibility is set forth in paragraph 13 of the presentence report and which states as follows:

>>On December 17, 2004, the defendant, in the presence of defense counsel who aided in the preparation, submitted the following unedited statement:

>>>>"I wrote letters against the president because I'm against the war and he's against my brothers. That's basically it.  I'm sorry.  What I did was wrong.  I take full responsibility for my actions.  I ain't going to do it no more.  They ain't got to worry about that." [sic]

The defendant was born on September 15, 1968.  He is presently 38 years old.  He has a ninth grade education and two dependents, a son and a daughter, born out of wedlock.  The defendant declares that he is able to read and write in English and is fluent in Arabic.  The defendant's education was interrupted when he was expelled from the Cleveland Public Schools for assaulting a principal.  The defendant's employment record indicates his last time of employment was for six months in 1989 through the Cuyahoga County Human Services.  The defendant's completed financial worksheets report that he has no assets, no monthly income, no monthly outflows, but is behind in child support.  The defendant indicates that he has never filed federal income taxes and has no credit history.

6

(1:04 CR 169)

The presentence investigation report completed in January of 2005, has an extensive resume of his mental and emotional problems in paragraphs 77 through 87, which are reproduced herein for the benefit of appellate review.

> The defendant reports he is presently not under the care of a mental health professional but there is a history of being under the care of mental health professionals.  He recalls that he was first placed at the Cleveland Psychiatric Institution for 60 to 90 days after a suicide attempt (he ran in front of a car) in 1988 or 1989.  He says he has also attempted suicide in the State of Ohio prison system (trying to hang himself "a few times").
>
> According to a previous Cuyahoga County Presentence Report, as of July 1989, the defendant had been in the Cleveland Psychiatric Institution for depression.  After his discharge from that hospital, he was to be treated at the Murtis H. Taylor Mental Health Center in Cleveland.  However, there was no verification this occurred.
>
> He indicates he is prescribed Rembron, and in the past he has taken Thorazine, Haldol, Melaril, and several other drugs.  He says he has been diagnosed with mental health problems his entire life, through the Juvenile Court System, State of Ohio, and county jail.  He belives he has been diagnosed a paranoid Schizophrenic, Antisocial Disorder and Borderline.
>
> The defendant admits to being abused by his father, to having depression, attempting suicide in the past, hurting others in the past, suffering from mood swings, and going into rages where he felt out of control.  He does believe he would benefit from mental health treatment.
>
> According to a July 20, 1990 Cuyahoga County Court Psychiatric Clinic Sanity Report, the defendant was diagnosed with Psychotic Disorder, Cocaine and Alcohol Dependence, and Antisocial Personality Disorder.  It was the psychologist's opinion that the defendant did not suffer from a mental disease or defect at the time he had committed the alleged offenses for which the report was being prepared.  The history would suggest that Mr. Cousins had experienced symptoms of a psychotic nature at various times in the past.

(1:04 CR 169)

>Also according to the Cuyahoga County Court Psychiatric Clinic Competence Report dated July 20, 1990, the defendant had been in the Cleveland Psychiatric Institution in 1989 after being seen in the Psychiatric Emergency Room at St. Vincent Charity Hospital and stating "I feel like killing myself." During his hospital stay at the Psychiatric Institute, his diagnostic impression on admission was psychosis, secondary to psychoactive substance abuse (cocaine dependence, alcohol dependence, and depression with suicidal ideation). There was also some evidence of an Anti-Social Personality Disorder and/or a Borderline Personality Disorder. While treated at the Institution, he received Haldol (an anti-psychotic medication) an Cogentin (an anti-Parkinson's medication) as needed. He was also given Desipramine (an anti-depressant). His final discharge diagnosis was Cocaine Dependence, Alcohol Dependence, and Psychosis, not otherwise specified. In addition, the clinicians were unable to rule out an Anti-Social Personality Disorder. The diagnosis in the competence report was psychotic disorder, cocaine and alcohol dependence, and Anti-Social Personality Disorder. It was the examiner's opinion the defendant was competent to stand trial. The report went on to say that while it appeared "...the defendant occasionally suffers from symptoms of a psychotic disorder, these symptoms are not active at the present time."
>
>According to an October 14, 1992 Sanity Report prepared by the Cuyahoga County Court Psychiatric Clinic, he was referred prior to trial in the two murder cases in which he has been convicted. The impressions of the report were Alcohol Dependence, Cocaine Dependence, Borderline Personality Disorder, and Anti-Social Personality Disorder. The examiner found that the defendant was not suffering from a disease or defect of the mind that so impaired his reason that he did not know the wrongfulness or could not refrain from the acts.
>
>Also according to this report, psychological and psychiatric reports from the Cuyahoga County Juvenile Court dated January and February of 1984 indicate no evidence of psychosis or significant depression. The defendant was seen at that time for evaluation because he tried to hang himself, indicating that his mother had not come to visit and he had problems with other youngsters. He was administered an IQ test, which was in the high borderline range of intellectual functioning. The report also indicates in 1987, the

8

(1:04 CR 169)

>defendant was placed on Thorazine while at TICO. This report indicates that his prior Cleveland Psychiatric Institute admission resulted in discharge on August 4, 1989. His IQ test at the Cleveland Psychiatric Institute reported being in the low normal range. The toxicology screening from St. Vincent Charity Hospital prior to his transfer to Cleveland Psychiatric Institution was positive for cocaine. This report also has information from a psychiatric evaluation done at the Southern Ohio Correctional Facility in February of 1991. The doctor there found no evidence of psychosis and was of the opinion the defendant was malingering mental illness. The impressions from this report indicate Alcohol and Cocaine Dependence, Borderline Personality Disorder and an Anti-Social Personality Disorder. It was the opinion of the writer that Cousins was competent to stand trial.
>
>According to a Forensic Mental health Evaluation completed by the Bureau of Prisons in August of 2004, he was given the Minnesota Multi-Facet Personality Inventory (MMPI), but the results were not valid. The validity scales of the MMPI reflected a severe exaggeration of psycho pathology. The diagnostic impression was Schizophrenia, Paranoid Type, possible malingering, Anti-Social Personality Disorder with Borderline Features (primary diagnosis) and no findings relevant to mental state. It was the writer's opinion that Mr. Cousins was competent to proceed at the time. The writer's prognosis of the defendant was good. Although the defendant reported a history of psychotic symptoms, it is possible that his reported psychotic symptoms are feigned or exaggerated. Even if the symptoms are genuine, his mental state was stable at the time, even in the absence of psychiatric treatment.
>
>According to a November 14, 2004 Psychological Evaluation conducted by James R. Eisenberg, Ph.D., his current diagnostic impressions were Schizophrenia, Paranoid Type, Delusional Disorder, Grandiose Type, and Anti-Social Personality Disorder with Borderline Features. It was the writer's opinion that Mr. Cousins is mentally ill and is suffering from Schizophrenia, Paranoid Type, and has Delusional Disorder based on his belief that he is a messiah. The writer indicates there is a possibility of malingering, or at least exaggeration of symptoms. It was the writer's opinion that Mr. Cousins understood the legal wrongfulness of the alleged criminal acts.

9

Case: 5:04-cr-00169-DDD  Doc #: 64  Filed:  05/17/07  10 of 17.  PageID #: 164

(1:04 CR 169)

> According to one of the psychological reports, the defendant admitted to auditory hallucinations, hearing his dead brother's voice giving him instructions. In addition to attempting to hang himself, he had cut himself and threatened to shoot himself.

The defendant has a serious history of substance abuse beginning at age nine. The history of substance abuse is highlighted by paragraph 95 of the presentence report which states:

> When asked if anybody has ever complained about his drug or alcohol use, he indicated his mother did. When asked if he ever lost an important relationship because of drinking or drugs, he responded he had killed a girl over drugs. According to a Cocaine Offender's Program in Cleveland, Ohio report dated September of 1990, the defendant was found to have met the criteria for cocaine dependence and alcohol abuse. There were many indicators of pathological use of chemicals which resulted in significant and recurrent social, legal, physical and psychological problems.

**(2) The Need for the Sentence Imposed**

**(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;**

The threat to kill the President of the United States is a serious offense and not to be taken lightly. Presidents Lincoln, Garfield, McKinley and Kennedy died by an assassin's bullet while serving as the President. President Reagan was nearly killed by an assassin. President Franklin Roosevelt was fortunate to survive an attempt on his life shortly after he was elected in 1932. This defendant, although incarcerated at the time he issued the threats to kill President George W. Bush, is now a proclaimed Muslim and a segment of the Muslim population employ terrorism and death to Americans as a way of life. A lengthy sentence is necessary to promote respect for the law and to provide just punishment.

**(B) to afford adequate deterrence to criminal conduct;**

10

(1:04 CR 169)

Threats to kill a president must be taken seriously by the American public. The Congress has provided lifetime security for presidents because of the potential for assassination. The Secret Service employs many agents to protect the President. No one should be led to believe that a threat to kill the President will be taken lightly, even if the threat is made in jest because the Secret Service must investigate all threats and a threat by a person who, like the defendant, already stands convicted of three separate homicides must be taken seriously. Once again, a lengthy sentence is necessary to afford adequate deterrence to the criminal conduct for which the defendant stands convicted.

### (C) to protect the public from further crimes of the defendant;[1]

The defendant is a serious recidivist who engages in violent conduct. His pattern of violence traces back to his youth. He was committed to custody for two separate assaults at age 15 and 17. (*See* paragraphs 40 & 41 in the presentence report). He was convicted of menacing at age 19. (*See* paragraph 43 in the presentence report). His convictions for cocaine drug abuse began at age 20. (*See* paragraphs 45, 46 and 47 ). At the age of 21, he was convicted of aggravated robbery while using a sawed-off shotgun and threatening to "blow out your brains". (*See* paragraph 48). At the age of 22, the defendant was convicted of felonious assault and sentenced to prison. (*See* paragraph 49). At the age of 23, the defendant, while incarcerated, was convicted of arson. (*See* paragraph 50). The defendant was convicted of his first murder (a

---

[1]During the defendant's colloquy, prior to the Court's pronouncement of the sentence, the defendant declared that he was innocent of the three homicides for which he stands convicted following, in each case, a plea of guilty.

11

(1:04 CR 169)

female victim) in 1992 for a May 12, 1988 homicide.[2] The second homicide victim, also a female, took place in November of 1989[3]. The defendant pled guilty to both homicides on November 24, 1992. (*See* paragraphs 51 and 52). The third homicide involved a male victim who was killed on August 25, 1988.[4] (*See* paragraph 53)

---

[2]The presentence report at paragraph 51 describes the homicide as follows:

> According to the Indictment, in May 12, 1988, the defendant caused the death of a female. He was originally charged with Aggravated Murder. According to the U.S. Pretrial Services report, the murder of this victim and the victim in CR284546 were related to drug incidents during which the victims [sic] refused to have sex with the defendant, and were strangled. According to prison officials, the defendant has 20 Assault convictions while incarcerated, 2 Arson convictions, and a Felonious Assault conviction. He is known for assaulting other inmates and guards by spitting at them and throwing fecal matter at them.

> According to a Court Psychiatric Clinic report, the defendant killed the female victim after getting "high" on cocaine, raped the victim, and then murdered her when she threatened to reveal the rape. After leaving the apartment, he boarded up the windows as best he could.

[3]The presentence at paragraph 52 describes the homicide as follows:

> According to the Indictment, on November 23, 1989, the defendant caused the death of a female. He was originally charged with Aggravated Murder.

> According to a Court Psychiatric Clinic Report, the defendant told a "drug" dealer the defendant would kill the victim because she was supposed to be pregnant by the defendant. The defendant got high on drugs before killing the victim.

[4]The presentence report indicating that the defendant pled guilty to involuntary

(continued...)

12

(1:04 CR 169)

The defendant has a parole hearing set for July 1, 2013.

During the initial sentencing hearing conducted in this case, the defendant's counsel suggested that the defendant be sentenced to immediate custody in a federal institution, a suggestion that the Court did not follow. While the defendant's appeal was pending, and as indicated herein, the defendant requested in a letter to the Court that he be ordered into federal custody to begin serving his sentence of 48 months. The Court responded and indicated that he had no power to issue such an order. The defendant responded with the letter, dated June 2, 2006, as previously described.

Against the background of that communication, the Court published an order on January 8, 2007, putting the defendant and his counsel on notice the fact that the Court was considering an upward variation based in part on the defendant's June 2, 2006 letter.

During the sentencing hearing conducted on May 16, 2007, the Court inquired of the defendant whether he wished to respond as to whether he had written the letter of June 2, 2006, with the threats as described herein. The defendant, after consulting with his counsel, stated that he denied writing the letter. The Court then inquired as to whether the defendant wished to testify under oath with respect to the issue of whether he wrote the letter of June 2, 2006. The defendant then declined to testify. The Court then found by a preponderance of evidence that the defendant was in fact the author of the letter of June 2, 2006.

---

[4](...continued)
manslaughter stated that according to the indictment, on August 25, 1988, the defendant caused the death of a male while in possession of a firearm. He was originally charged with aggravated murder.

13

(1:04 CR 169)

The defendant's history of violent conduct, coupled with his obvious unstable mental condition as reflected in the presentence report, and as further indicated in the medical records of the defendant while incarcerated, strongly suggest that this defendant should never again be pardon, paroled, or released into society.  The danger that the defendant would present to society, be it at the conclusion of his state sentence, when and if paroled, or upon the completion of the consecutive federal sentence in this case, is abundantly obvious when one studies the defendant's record of criminal conduct accompanied by his continuing belief that it is proper to engage in threats to kill anyone involved in his prosecutions, be it the United States Attorney, the sentencing judge, or the wife of the sentencing judge.[5]  Threats to kill have more credibility when the person who threatens the killing has already demonstrated, as does this defendant, the ability to kill another person for whatever reason.  The Court is struck with the fact that the most recent threat to behead the Court's wife is accompanied by a history of having previously killed two women, so it is apparent that this defendant is not deterred from homicide where a woman is the victim.

Against that background, the Court finds under its responsibility to consider a sentence designed to protect the public from further crimes of the defendant, that the pronounced sentence of 60 months, to run consecutive to the sentences the defendant is now serving in the state of

---

[5]Prior to the defendant entering a plea of guilty, he threatened to kill the Assistant United States Attorney prosecuting his case as well as this judge.  A motion for the Court to recuse was then filed (see Docket No. 20) and the Court denied the motion (see Docket No. 25) on the premise that if the Court recused and the case was assigned to another judge, the defendant would be encouraged to making similar threats with similar recusal motions.  It was not until the defendant's appeal was pending before the Sixth Circuit that the defendant then decided, as indicated in his June 2, 2006 letter to up the ante by threatening to "behead" the Court's wife.

14

(1:04 CR 169)

Ohio, is justified. The Court's holds to this view, if in the view of the reviewing court the Court's adjusted calculation of the advisory sentencing guideline range to a period of 51 to 63 months was erroneous. If the Sixth Circuit finds that the previously determined advisory sentencing guideline range was *res judicata* calling for a sentencing range of 37 to 46 months, the Court engages in an upward variance based on the reasoning set forth herein.

The Court concludes that the 60 month sentence should be consecutive and not concurrent with the defendant's obligation to complete his state sentences. This Court has no power over the State of Ohio with respect to a subsequent decision to release the defendant on parole. It is apparent to the Court, as reflected in the supplemental record filed by defendant's counsel under seal, that the defendant has been and will probably continue to be an unrelenting problem for the correctional personnel in Ohio. Against that background, this Court has to consider the possibility that the defendant will be placed on parole in Ohio. If the Court were to make the sentence in this case to be served concurrently with the Ohio sentences, it is this Court's view that a concurrent sentence would endanger the public based on the defendant's record as herein described. Thus, the Court has determined that the 60 month sentence in this case should be served consecutively to the Ohio sentences which the defendant is presently serving.

> **(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;**

The record provided by defendant's counsel (*see* Docket No. 60), demonstrates that the defendant will undoubtedly be in need of medical care for the balance of his life. The Court is of

15

(1:04 CR 169)

the belief that the federal correctional system has the resources to provide adequate medical care for the defendant. It appears from the record that the defendant is unemployable unless he develops vocational skills while in the federal system. His record of misconduct while incarcerated suggests that giving the defendant the opportunity to engage in vocational training will probably be difficult, if not impossible.

## Conclusion

For the reasons set forth herein, a sentence for a period of 60 months with supervised release for three years and consecutive to his present term of imprisonment in the state of Ohio, is a sentence sufficient, but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a)(2) based upon either the Court's re-calculation of the advisory sentencing guideline range from 37 to 46 months to a range of 51 to 63 months or upon the Court's decision to vary upward from the maximum of 46 months to 60 months in the event the Sixth Circuit, upon appeal, determines that the Court erred in denying the defendant the three level reduction for acceptance of responsibility, as a matter of law, or based upon the proposition that the

(1:04 CR 169)

calculation of the offense level and the criminal history category as initially determined, constitutes a *res judicata* determination of the offense level and the criminal history category.

The clerk is directed to attach a copy of this memorandum opinion to its sentencing order[6].


IT IS SO ORDERED.


| May 17, 2007 | /s/ David D. Dowd, Jr. |
|---|---|
| Date | David D. Dowd, Jr. |
| | U.S. District Judge |

---

[6]The Court requested that Dennis Terez, who now occupies the position as the Federal Defender for the Northern District of Ohio, file a timely notice of appeal for the defendant and then timely notify the Court whether he wishes to continue as appellate counsel for the defendant.